UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
THOMAS MURRAY,

                             Plaintiff,

                     07 CV 10637 (HB)

        - against -

                     OPINION & ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                            Defendants.
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

The case arises out of a dispute for disability insurance benefit payments for the period of July 15, 2000, the day Plaintiff alleges he became disabled, through December 31, 2004, the date on which the Plaintiff is alleged to have last met the disability insurance requirements of the Social Security Act, 42 U.S.C. § 423.[1] On November 11, 2007, Plaintiff Thomas Murray ("Plaintiff") commenced this action to challenge the final determination of the Commissioner of Social Security"Defendant") that the Plaintiff was not disabled within the meaning of the Social Security Act ("Commissioner") (and thus not entitled to disability benefits. On April 8, 2008, the Commissioner moved for judgment on the pleadings on the grounds that the determination of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Because the ALJ failed to apply the correct legal standard in his determination that Plaintiff is not disabled and his conclusion is not supported by substantial evidence, Defendant's motion for judgment on the pleadings is denied and the case is remanded for further proceedings consistent with this Opinion to determine whether Plaintiff is eligible for benefits for the period in question July 15, 2000 through December 31, 2004.

---

[1] *See Dousewicz v. Harris* 646 F.2d 771 (2d Cir. 1981) (citing *Parker v. Harris,* 626 F.2d 225, 228, n.3 (2d Cir. 1980)). To be insured for disability benefits in a given month, an individual must meet certain earnings requirements for twenty of the forty quarters ending with the quarter in which that month occurred.

1

# I. FACTUAL BACKGROUND[2]

## A. Procedural History

On May 14, 2003, Plaintiff applied for disability insurance benefit payments and his application was denied by the Commissioner. (R. 45-48.) On August 26, 2004, Plaintiff requested an ALJ hearing after his second application for disability insurance benefits was denied. (R. 29, 127-30.) The hearing was held on June 13, 2006, and on June 30, 2006 the ALJ issued a decision finding that Plaintiff was not disabled. (R. 30-39, 528-60.) On October 23, 2006 the Appeals Council remanded the case back to the ALJ, ordering that the ALJ hear expert medical testimony from an orthopedist and explain why testimony from certain doctors that the Plaintiff had seen were not given any weight. (R. 40-44.) The ALJ reconsidered the case *de novo*, and on April 20, 2007, issued a decision that found that Plaintiff was not disabled. (R. 14-28.) On September 5, 2007 the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 5-9.)

Plaintiff commenced this action to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and requests that the Commissioner's decision be vacated and that damages be awarded for the period of July 15, 2000 through December 31, 2004 based on the fact that the decision of the ALJ was not supported by substantial evidence and was contrary to law. On April 8, 2008, the Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

## B. Non-medical Evidence

*Vocational Background.* Plaintiff was thirty-eight years old at the time of the ALJ's most recent decision. (R. 28 (ALJ Decision April 20, 2007).) He graduated from high school and attended one year of college and the police academy. (R. 531, 566.) From 1991 through 1999, Plaintiff worked as a detective for the New York City Police Department. (R. 153, 188, 197, 230.) In 1998, due to a shoulder injury that occurred while on active duty, Plaintiff was placed on restricted duty, and he retired for medical reasons from the police force in January 1999 at age thirty. (R. 152, 574.) In July 1999, Plaintiff was treated at Nyack Hospital when he accidentally sliced an artery in his right forearm with a knife while trying to cook for himself. (R. 509-21.)

From 1998 through July 2000, the Plaintiff worked as a bodyguard (essentially an armed driver) and as a security guard/bouncer at two restaurants. (R. 296, 537, 573.) Plaintiff testified

---

[2] The facts derive from the administrative record (cited "R. _."), which was filed with the Government's answer.

that he was forced to stop because he was unable to stand, sit, and get out of the car. (R. 537.) Similarly, Plaintiff testified that in 2001 he earned $345 doing security work but stopped because he could not stand or drive for long periods of time. (R. 566, 577.) Plaintiff owned a pub from 2000 until May 2005 when Plaintiff was forced to close it due to his inability to be present and watch over the pub's books. (R. 230, 531-33, 575.) Plaintiff testified that for two or three months in 2005 he would work an hour or two a week as a handyman. (R.624.) He testified that during a typical month he would only earn $150-200. (R. 624.) Since then the Plaintiff has not done any work for pay. (R. 538.)

C.   **Relevant Medical Evidence**

   1. Right Shoulder Injury

*Treating Orthopedist, Steven Harwin, M.D.* Dr. Harwin has treated the Plaintiff's right shoulder for over 10 years. (R. 253, 256-57.) After examining the Plaintiff and analyzing an MRI in 1994, Dr. Harwin operated on the Plaintiff's right shoulder. (R. 253, 256-57, 264-65, 270.) Plaintiff continued to seek treatment with Dr. Harwin and when the Plaintiff reinjured his shoulder at work in March 1998, Dr. Harwin performed a second surgery on Plaintiff's right shoulder. (R. 260-70.) However, the Plaintiff continued to experience localized pain in his shoulder and on July 29, 1998, Dr. Harwin agreed that the Plaintiff should apply for retirement from the police force. (R. 343, 419.)

After the Plaintiff complained to Dr. Harwin of shoulder and neck pain, an MRI was taken on September 3, 2003, which showed large amounts of damage to Plaintiff's right shoulder.[3] On September 24, 2003, Dr. Harwin reviewed Plaintiff's MRI.[4] (R. 340.) After a discussion between Dr. Harwin and the Plaintiff, Dr. Harwin suggested a third surgery. (R. 340.) There is no indication in the record that the Plaintiff ever underwent a third surgery.

In an October 4, 2004 medical report, Dr. Harwin stated that due to the Plaintiff's right shoulder injuries, he could not lift more than five pounds and that he was limited with respect to his abilities to lift, push, or pull.[5] (R. 334-39.) Dr. Harwin stated that there was no limitation to the Plaintiff's abilities to sit, stand, or walk. (R. 337.) The questionnaire did not ask Dr. Harwin

---

[3] According to the radiologist the MRI showed moderate glenohumeral joint effusion with a small loose body; tear of the anterior glenoid labrum with a cyst; mild to moderate glenohumeral joint arthrosis; and supraspinatus "tendinosis" with moderate partial thickness rotator cuff tear at the articular side of the distal supraspinatus and infraspinaturs tendons. (R. 403-404.)
[4] He agreed with the radiologist's findings for the most part, but added that the right biceps tendon was not intact. (R. 340.)
[5] Dr. Harwin does not state how limited the Plaintiff was in terms of his abilities to lift, push, or pull. (R. 337.)

3

to make any findings with regard to the Plaintiff's abilities to perform fine motor functions with his hands or as to Plaintiff's level of pain or ability to work. (R. 334-39.)

On December 6, 2005, Dr. Harwin completed a "Multiple Impairment Questionnaire" based on Plaintiff's MRIs from 1994 and 2003. (R. 431.) Dr. Harwin's diagnosis reported rupture of the right biceps, supraspinatus tendon, cervical spondylosis, moderate tear of glenohumeral joint, and arthrosis of the rotator cuff. (R. 431.) Plaintiff had daily right shoulder pain, rated at seven to eight out of ten. (R. 432-33.) Dr. Harwin opined that in an eight-hour workday, Plaintiff could sit one hour and stand or walk two hours; he could not do any lifting and would have difficulty performing repetitive reaching, handling, fingering, or lifting due to pain radiating to his hands; and he would not be able to hold competitive employment that required him to keep his neck in a constant position (such as to look at a computer screen or look down at a desk.) (R. 433-35.) According to Dr. Harwin, Plaintiff frequently experienced pain at a level that would interfere with his attention and concentration and that Plaintiff would need to take unpredictable breaks, for an average of 20 minutes at a time, every day. (R. 436.)

*Doctor for the Social Security Commissioner, Steven Weinstein, M.D., Consultative Examination.* Dr. Steven Weinstein, an internist, examined Plaintiff on July 21, 2003 after the Plaintiff first applied for Social Security disability benefits. (R. 124-26, 295-98.) Dr. Weinstein found that Plaintiff had chronic right shoulder pain and a history of chronic bicep tears, labral tears, and rotator cuff tears. (R. 298.) Dr. Weinstein opined that Plaintiff's abilities to sit, stand, and walk, were without significant limitation. (R. 298.) However, he noted Plaintiff's abilities to push, pull, and carry with the right arm was significantly restricted. (R. 298.) Dr. Weinstein did not note the amount of pain the Plaintiff was in or whether the Plaintiff could perform sedentary work without lapses in concentration or the need to take breaks. (R. 295-98.)

*Doctor for the Social Security Commissioner, William Lathan, M.D., Internist, Consultative Examination.* On October 11, 2004, Dr. William Lathan examined Plaintiff after the Plaintiff's second application for social security benefits and diagnosed a history of right shoulder derangement, hypertension, and back syndrome. (R. 127-30, 366.) He found that Plaintiff had "moderate restrictions for activities that require bending, lifting, carrying, pushing, pulling, and reaching with the right upper extremity." (R. 366.)

*Orthopedic Specialist for Plaintiff, Joseph Defeo M.D., Consultative Examination.* On May 10, 2006, before the first ALJ decision issued on June 30, 2006, Dr. Joseph Defeo examined

Plaintiff and reviewed his medical records for the purpose of determining the Plaintiff's level of disability and work potential. (R. 14-28, 30-39, 458-64.) Dr. Defeo opined that Plaintiff had damage in his right shoulder that compromised function of his upper extremities dating back to 1994.[6] (R. 463). Based on these impairments Dr. Defeo opined that the Plaintiff should avoid lifting and carrying, repetitive bending, working overhead, climbing stairs, and fine manual dexterity on a repetitive basis. (R. 464). Dr. Defeo wrote that the nature of the Plaintiff's pain was chronic, progressive, and radiating. (R. 466.)

*Orthopedic Specialist for Plaintiff, Donald Goldman M.D., Consultative Examination.* On November 27, 2006, after the first ALJ decision issued on June 30, 2006, Dr. Goldman examined the Plaintiff and reviewed his medical records. (R. 485.) He opined that the Plaintiff had sustained painful functional restrictions of motion by more than 30 percent (R. 485.) He found that the Plaintiff was permanently disabled and should receive Social Security disability benefits. (R. 485.)

On January 27, 2007, Dr. Goldman opined in a questionnaire that since 1998, Plaintiff was able to occasionally lift and carry up to five pounds; had moderate restriction of his abilities to grasp, turn, and twist objects; mild to moderate restrictions of fine manipulation; and marked restrictions of reaching (including overhead) due to his right shoulder impairment. (R. 493-98.)

**D.     Hearing Testimony**

<u>Plaintiff's Testimony</u>

Plaintiff testified at the June 13, 2006 hearing that the surgeries on his right shoulder had initially relieved the pain, "but now it's just a constant – anything you do it pops out, goes back in. If the weather's bad, every thing hurts." (R. 545.) He stated, "I could be reaching for a glass of water and it will pop out." (R. 545.)

At the second ALJ hearing on February 27, 2007, Plaintiff testified that as a result of his shoulder whenever he turns pain radiates across his chest like he is being "stuck with something." (R. 588.) Plaintiff also testified that to relieve pain he takes numerous showers a day and lies down two or three times a day for an hour or two at a time. (R. 587.)

---

[6] Dr. Defeo noted spondyloss of the cervical spine, chronic rotator cuff tendonitis with a tear, and a ruptured bicep tendon.

5

Medical Expert's Testimony

There was no medical testimony at the June 13, 2006 hearing. The ALJ relied solely on the medical evidence in the record. After the decision, the Appeals Council remanded the case in order to "obtain evidence from an orthopedist to review the medical records and provide opinion as to the claimant's ability to perform work-related activity on a sustained basis, that is, 8 hours a day and 40 hours a week." (R. 43.) But instead of procuring an orthopedist as the Appeals Council ordered, the Commissioner provided testimony at the second hearing from Dr. Harold Bernanke, a non-examining, internist. (R. 43, 598-616.) He testified that Plaintiff was limited with respect to overhead reaching and using his hand for repetitive actions, but would have been able to lift ten pounds using both arms. (R. 605-08.) He testified that from 2000 until the date last insured, Plaintiff's limitations related only to his right arm; otherwise he was able to sit, stand and use both hands. (R. 607.) However, when Dr. Bernanke testified, he had not examined the Plaintiff or the entire medical record including the Plaintiff's medical records from 1999 when he sliced an artery in his right forearm. (R. 509-21, 620-21.)

Vocational Expert Testimony

Vocational Expert, Andrew Pasternak, testified at the February 2007 administrative hearing that an individual who was thirty-six years of age, had twelve years of education, and prior work experience as a police detective, a bar owner, and other private security work, and who could perform sedentary work, with no overhead reaching with the right arm, and moderate limitations for grasping, twisting, turning and fine manipulations would not be able to perform any of his past jobs. (R. 625-31.) Mr. Pasternak also testified that this same individual would be able to perform the job of surveillance system monitor,[7] skip tracer,[8] or insurance company investigator.[9] (R. 627-28.)

However, the Vocational Expert testified that a person who suffered from pain, fatigue, or other symptoms that interfere with pain or concentration "couldn't work." (R. 630.) This hypothetical was based on Dr. Harwin's 2005 medical questionnaire. (R. 431-38, 630.) The ALJ precluded the vocational expert from testifying to any hypothetical based upon the opinions

---

[7] DOT 379.367-010, WL DICOT 379.367-010, of which there were 250,000 positions nationally and 3,000 locally.
[8] DOT 241.367-026, WL DICOT 241.367-026, of which there were 494,000 positions nationally and 2,000-3,000 locally.
[9] DOT 241.267-030, WL DICOT 241.267-030, of which there were 630,000 positions nationally and 3,000 locally.

6

of orthopedic specialists Drs. Goldman and Defeo because the medical specialists saw the Plaintiff one time, "long, long, long, long, long, after the DLI (date last insured)." (R. 631.)

## II. DISCUSSION

"A [federal district] court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "On review, [a court] may only set aside a determination which is based upon legal error or not substantiated by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the Commissioner's determination as to any fact is supported by substantial evidence, the decision shall be conclusive. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). The court is "precluded from undertaking a *de novo* standard of review," *Valentin v. Barnhart*, 339 F. Supp. 2d 596, 598 (S.D.N.Y. 2004), and it must affirm the Commissioner's decision if there is substantial evidence to support the conclusion, even if "the district court might have ruled differently were it to have made the initial determination," *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

A person is disabled and eligible to receive Social Security disability benefits when that person is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). That impairment must be of such severity that the person "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). The burden of proving disability is on the claimant. 42 U.S.C. § 423(d)(5). "Once the claimant has established a prima facie case by showing that his impairment prevents his return to his prior employment, the burden shifts to the [Commissioner], who must produce evidence to show the existence of alternative substantial gainful work which the claimant could perform." *See Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999) (quoting *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

Normally a Commissioner meets his burden "by resorting to the applicable medical vocational guidelines (the grids)." *Rosa*, 168 F.3d at 78 (quoting *Bapp v. Bowen,* 802 F.2d 601,

604 (2d Cir. 1986). However, "exclusive reliance on the grids may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform." *Id.* Nonexertional limitations are "impairments that affect [a person's] ability to meet the requirements of jobs other than strength demands, and include manipulative impairments and pain." *Sobolweski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a(a), (c)). To satisfy its burden of proof the Commissioner must provide "affirmative evidence demonstrating [claimant's] residual functional capacity to meet the demands of sedentary work," despite the presence of exertional and nonexertional impairments. *Rosa*, 168 F.3d at 80-81.

Generally, more weight is given to an opinion from a treating source. *See Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). "If a treating source's opinion on the issue of the nature and severity of the claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case, it is given controlling weight." *Id*. The ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. *Rosa*, 168 F.3d 72; *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."); *see also Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceived inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").

When controlling weight is not given to the treating source because it is inconsistent with the other substantial evidence in the case, various factors in the regulations are applied to determine what weight to give the medical opinions in the record. *Schisler*, 3 F.3d at 567. The factors that determine the weight to give a treating physician's opinion are: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d); *Schisler*, 3 F.3d at 567.

8

The amount of weight given to a medical opinion is not affected by the fact that the opinion is made after the date the claimant is entitled to insurance benefits so long as the diagnosis is based on a "medically accepted clinical diagnostic technique" and whether "considered in light of the entire record, it establishes the existence of a 'physical impairment' prior to" the date the Plaintiff was last entitled to benefits. *Dousewicz*, 646 F.2d at 774.

If the ALJ failed to apply the correct legal standard in reaching the factual conclusions underlying the determination to deny benefits, the ALJ's factual findings are not conclusive and the court has the power to reverse the ALJ's decision if the record so warrants. *Bonnet v. Astrue*, No. 05 Civ. 2970, Slip. Op (S.D.N.Y. Aug. 22, 2008).

On April 20, 2007, after reviewing the record and holding the second hearing, the ALJ made the following findings of fact and conclusions of law. (R. 14-28.) The Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2004. (R. 23.) Through the date last insured, the Plaintiff had the following severe impairments: "chronic right shoulder pain, status-post two injuries and arthroscopic surgeries."[10] (R. 23.) The ALJ found that the claimant had the residual functional capacity to perform a wide range of sedentary work that does not require repetitive overhead reaching with the right, dominant upper extremity. (R. 24.) Through the date last insured, the claimant was unable to perform past relevant work. (R. 26.) However, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could have performed. (R. 27.)

Reviewing the record and the law, I find that the ALJ committed several legal errors in the most recent decision. The ALJ erred when he found that the claimant could perform a wide range of sedentary work because he failed to apply the proper weight to the medical opinions in the record. First, he failed to give controlling weight to Dr. Harwin, or at the very least substantial weight based on the factors of 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). (R. 14-28.) Second, he ignored or rejected opinions that were made after the date last insured, but based on physical impairments that existed at the time when the Plaintiff was insured. (R. 26.)

As Plaintiff's treating physician, Dr. Harwin's opinions should be given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic

---

[10] The ALJ is referring to knee injuries and obesity that the Plaintiff developed after the date last insured. For our purposes this injury is irrelevant and will not be discussed.

9

techniques and are not inconsistent with the other substantial evidence in the case. 20 C.F.R. §416.927(d)(2); *Bonnet*, 05cv2970, Slip. Op. at 4. On December 6, 2005, based on his previous examinations and the MRIs from July 1994 and September 2003, Dr. Harwin opined that Plaintiff was in significant pain, had frequent interruption of his concentration, would be forced to take unscheduled breaks, and would be prevented from performing a job that required sitting and staring at a computer screen. Dr. Harwin also opined that the Plaintiff could only sit and stand or walk for 1 to 2 hours an eight-hour workday.

The ALJ discredited Dr. Harwin's 2005 questionnaire finding that the doctor's opinion that Mr. Murray could not sit, stand, or walk for more than 1 to 2 hours a day was made after the date the Plaintiff was last entitled to disability insurance and not supported by the evidence. (R. 26.) But the fact that the opinion was given after the date the Plaintiff was entitled to disability is irrelevant. *Dousewicz* 646 F.2d at 774. The ALJ also found inconsistencies between Dr. Harwin's 2004 and 2005 opinions, as well as Dr. Weinstein's and Dr. Lathan's opinions regarding whether the Plaintiff was restricted in his ability to sit and stand. (R. 26.) However, where there are inconsistencies, it is the ALJ's affirmative duty to seek out more information from the treating physician and develop the record accordingly. *Rosa*, 168 F.3d at 79. There is no indication that such an effort was made by the ALJ in this case.

If the inconsistencies with sitting, standing or walking cause Dr. Harwin's opinion not to receive controlling weight, the opinion must nonetheless be looked at based on the factors set out in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). *See Bonnet*, 05cv2970, Slip. Op. at 4-5. The ALJ completely avoided such an analysis and based his holding on the opinions of the internists, Drs. Weinstein and Lathan, to the effect that the Plaintiff could sit, stand, and walk without restriction. (R. 21-22.) If the ALJ applied the Commissioner's regulations, he would have looked at Dr. Harwin's 2005 opinion and given it substantial weight based on the frequent treatment of the Plaintiff for more than 10 years, the MRI's from 1994 and 2003, the supporting opinions of specialists Drs. Defeo and Goldman, and the fact that Dr. Harwin, the treating physician, is also a specialist. 20 C.F.R. 404.1527(d)(2).

Even if Dr. Harwin's 2005 opinion that Plaintiff could not sit, stand, or walk for an eight-hour workday is omitted, the ALJ erred by not basing his decision on the Commissioner's regulations, which indicate that specialists should be given more weight then non-specialists. 20 C.F.R. § 404.1527(d)(5). Based on the Commissioner's regulations, Drs. Weinstein and Lathan,

who are non-specialists, should be given less weight then Drs. Defeo, and Goldman, who are specialists and opined that the Plaintiff could not sit, stand, or walk for an eight-hour workday. 20 C.F.R. §§ 404.1527(d)(5).

However, the dispute about whether the Plaintiff could sit, stand, or walk for an eight-hour workday does not affect whether the Plaintiff's right shoulder caused him enough nonexertional impairments, such as substantial pain that affected his concentration, to disable him from sedentary employment. Every doctor that dealt with the Plaintiff indicated that he had right shoulder injuries that caused him pain. All three orthopedic specialists, Drs. Harwin, Defeo, and Goldman, indicated that the Plaintiff's shoulder caused him substantial pain that would exclude him from full-time employment. (R. 433, 463, 467, 485.) Their opinions are all supported by objective medical evidence. Objective medical evidence is defined as "medical signs" which are "anatomical, physiological or psychological abnormalities which can be observed." 20 C.F.R. §416.928(b); *Bonnet*, 05cv2970, Slip. Op. at 5. The numerous MRIs, examinations, and medical reports all provide objective medical evidence to support the opinion that the Plaintiff was in substantial pain that would affect his ability to work during the time period that he was denied benefits.

The vocational expert testified that a person with the Plaintiff's injuries could not perform his previous job. (R. 626.) He testified that if a person suffered from symptoms that interfere with concentration, such a person "couldn't work." (R. 630.) This statement by the vocational expert does not necessarily mean that this Plaintiff had enough interference due to pain to inhibit his concentration to the extent that he couldn't work. However, the vocational expert was not allowed to answer hypotheticals based on Drs. Defeo's and Goldman's opinions, which might have shed light on this issue. (R. 631-34.) The ALJ erroneously excluded their opinions because they were made after the Plaintiff was last entitled to disability insurance. *Id.*; *Dousewicz,* 646 F.2d at 774.

After it was determined that the Plaintiff could not perform his previous jobs, the Commissioner failed to determine if there were jobs that this Plaintiff could perform. The Commissioner had three opportunities to obtain an orthopedic specialist to evaluate the Plaintiff's right shoulder and determine the amounts of pain and limitations that the shoulder injury would cause. Despite the fact that an orthopedic specialist would be useful in determining the nature and extent of the shoulder injury and how it impaired the claimant, the Commissioner

did not procure the services of an orthopedic specialist after the Plaintiff's first complaint on May 14, 2003, nor after the Plaintiff's second complaint on August 26, 2004, or even after the Appeals Council remanded the matter in order for the ALJ to obtain evidence from an orthopedist on September 5, 2007. Instead, the Commissioner simply decided that it would be sufficient to offer the testimony of Dr. Bernanke, a non-examining internist, even though the factors laid out in 20 C.F.R. § 404.1527(f) dictate that Dr. Bernanke's opinion should receive little to no weight in this case.

All four of the Plaintiff's orthopedic specialists, including the Plaintiff's treating physician for over 10 years, provided evidence that the Plaintiff suffered from substantial impairments including limitations to concentration due to continuing pain symptoms that were present during the dates that he was entitled to benefits.

The ALJ erred by excluding the treating and specialist opinions because they were given after the Plaintiff was last eligible to receive disability insurance even though they were based on medical evidence prior to that date. He improperly weighed the opinions from experts that had examined the Plaintiff, including the Plaintiff's own treating physician. Finally, as a result of not giving proper weight to the medical opinions, the ALJ erred in finding that the Commissioner had provided substantial evidence that there were jobs in the economy, which the claimant could obtain and perform.

The ALJ has an affirmative duty to develop and resolve any ambiguities and major gaps in the record before determining the weight to be given to a treating source. Thus, the issue of physical disability during the period of July 15, 2000 through December 31, 2004 should be remanded for further development of the record.

### III. CONCLUSION

For the foregoing reasons, the Court denies Commissioner's motion for judgment on the pleadings on the grounds that the ALJ omitted consideration of legal principles and that his decision is not supported by substantial evidence. The Clerk of the Court is requested to remand this case to the Social Security Administration for further proceedings consistent with this opinion and close the case and remove it from my docket.

**SO ORDERED**
New York, New York
October 4, 2008

_____
U.S.D.J.

12